All right, Mr. Srebnick, whenever you're ready to proceed. Good morning, and may it please the Court, today's case, Javad and Soto, addresses the where manufacturers, sellers of goods, attempt to discriminate pricing based on the ultimate destination of the goods sold into the marketplace, essentially trying to control the secondary market of consumer goods. In this case, Javad, Soto engaged in deception, deception that led the sellers to believe that Javad was going to buy the goods, pay for them at a profit to the seller, that Javad would then resell them at a profit, but in a destination outside the United States, when in fact it was always Javad's intent to resell those goods within the United States. The government alleged in the indictment that Javad unjustly enriched himself by way of that deception, that the sellers would have declined to offer the discounted price, the so-called discounted price, had the seller known that Javad's true intention was to resell those goods, not in a foreign destination, but here domestically within the United States. But what the indictment did not allege, and what the motion to dismiss that was brought in the district court argued, is that the mere unjust enrichment that Javad was able to take advantage of a price discrimination practice here in the United States, that deception did not financially injure the sellers. The indictment alleges that nowhere. Rather, the indictment, and I provided a copy for the court's reference in the binder, that's ... Counsel, the indictment does allege that your client, quote, intend, I'll say intended, it says intend, intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representation and promises knowing that they were false and fraudulent when made, and for the purpose of executing that scheme to defraud. It's on page four of the superseding indictment. That's correct. How is that, and your client pled guilty to that, how is that not, at least as to your client, not Mr. Soto, I'm going to put him aside for the moment, as to your client, how  court's subject matter jurisdiction to hear this appeal? The exact same scenario occurred in United States v. Michael Peter, a case that I handled both at the district court level and at the court of appeals level where Mr. Peter also pled guilty to an indictment that alleged mail fraud, wire fraud. In Peter, there was a case which had narrowed the scope of what it was that he had been charged with to such that it was no longer an offense solely looking in the indictment. We don't have that situation here. Actually, we do. We have the case of Simonelli v. United States decided by the Supreme Court about six months ago that rejected wholesale the government's theory that it could prosecute based on the right to control, that a company cannot claim a right to control. I know, but Mr. Shrevenick, there's an allegation here that there was an intent to defraud. The whole concept of, the whole argument here is that there was only an intent to deceive, not an intent to defraud. While there are means and manners here and purpose of it, the indictment is not an exclusive document regarding that where there is an allegation of intent to defraud where your client pled guilty to intending to defraud in doing what he did. If the only distinction under Tarkov is that you have to actually intend to defraud someone of money as opposed to just deceive them without any loss of money and your client pled guilty to that very thing and he was charged with that very thing, I'm having trouble understanding how this indictment doesn't have jurisdiction. Mr. Soto's situation is different. So we have a factual basis for the plea. The only thing that Mr. Javad admitted is contained within the factual basis for the plea. No doubt the indictment alleges the elements and an element of mail fraud and wire fraud no doubt is an intent to defraud, but it was defined in the indictment in the purpose of the conspiracy, same page your honor was pointing to, paragraph three, it defines the purpose of the conspiracy to unjustly enrich themselves by obtaining the consumer goods at deeply discounted prices by falsely and fraudulently representing them they were for distribution outside the United States when in fact they were not. That purpose of the conspiracy under Takalov, under Simonelli does not constitute a sufficient allegation of a scheme to defraud that this court has already defined. Takalov presented an exactly the same indictment. Paragraph seven of the superseding indictment says, based on the false and fraudulent representations of the defendants and their co-conspirators, including that their products were to be purchased solely for use and distribution outside the United States and in some instances that their products would be provided to the U.S. military, the victim company sold their products to the defendants at deeply discounted prices that they would not have otherwise offered but for the defendants false and fraudulent representations as the intended use and destination of their products. Why doesn't that show the necessary material misrepresentation and the intent to harm? So I actually highlighted that for your honor's benefit so I'm glad the court is focusing on that. Paragraph seven of the indictment does not allege that the seller could have sold that However, you admitted it at sentencing. At the sentencing, the court said, and we know they could have sold them in the United States. Now this is page 28. We know they could have sold them in the United States because the defendants did. Answer by you, true. Question by the court, at higher prices than they got them. Answer by you, that's true. And then the district court says, so we know there's a loss. So of course, Mr. Javad, having resold the goods into the United States market proves that there was ultimately a buyer down the road for the product at a price higher than Mr. Javad paid, but not at the list price. I, of course, admitted because it was obvious Mr. Javad bought these products to resell them in the United States at a price higher than he paid for them. The seller was unwilling because of its price discrimination practices to lower its price, they say. They chose to forego that sale that Mr. Javad captured. The sellers chose to forego the sales at the lower prices. And so Mr. Javad, by claiming he was selling the goods for export, to borrow the example from Takalov, he was willing to pay five quarters for a dollar, which gave the seller a profit. The seller would have preferred to charge him six quarters for a dollar. The seller would have preferred to charge anybody in the marketplace six quarters for a dollar, but there was no buyer at six quarters for a dollar. So Javad buys it for five quarters per dollar and he sells it into the marketplace and there's no allegation or evidence that his sale into the marketplace in the U.S. displaced, actually displaced. Well, there is though, isn't there? I mean, for example, there's the evidence, I'm trying to remember which company it was who testified to this, but one of the companies testified that the way they became suspicious of your clients is because their normal customers started to order less or less frequently. And it turned out that your clients were selling them the very goods that they had sold to your clients, thinking they were going to be used by the United States military in Afghanistan. So I think you're referring, I think it was Andover or was it? It could have been Andover. It was Andover. So the companies became suspicious because of changes in the marketplace. They thought they were losing market share, they thought, and of course under the Lancaster case out of the Ninth Circuit, a loss of market share in and of itself does not constitute a property right. That aside, to answer directly that particular one company that made that allegation, although they were suspicious and although Javad they thought was the one that was selling to that was not at the list price. So can I ask, I'm going to talk about Takalov a little bit. So Takalov also points to and cites and quotes extensively from two Second Circuit cases to say that our law is actually consistent with that. One of those is a case called region office supply. And in that case, the Second Circuit said, quote, we conclude that the defendants intended to deceive their customers, but they did not tend to defraud them because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain, nor of influencing his assessment of the value of the bargain to him. Isn't that exactly what we have here, the opposite of that? In other words, didn't all the suppliers that testified at trial say that they were capable of affecting the customer's understanding of the bargain? In other words, that by misrepresenting where these products were going and who they were of how they negotiated with Jabbat, and that it influenced their assessment, the customer's assessment of the value of the bargain to them. In other words, they would have priced it very differently if they knew the goods were not going to Afghanistan and not going to soldiers. Why is that not exactly what we said in Takalov was sufficient? Because exactly in Takalov, the misrepresentation in Takalov, as the court I'm sure recalls, was that the person, the patron was paying for an expensive bottle of champagne under the misrepresentation that he was sharing it with a tourist, not an employee who was masquerading as a tourist. It seems to me, though, to Andover and to Sklar and to the companies that testified, they were buying what they thought was Pappy Van Winkle, but essentially getting bullets. And I know you disagree with that. I understand that. But from their perspective, giving a benefit to soldiers in Afghanistan was Pappy Van Winkle to them. And instead, they were given really, really bad whiskey. They sold it at the export price. That same price was available to anyone that was exporting, whether it was going to the military, whether it was going to China, whether it was going to the Soviet bloc. Testimony seems pretty consistent that this was the lowest price we've ever sold it to. We would never have done it but for the fact that we were told that what was going on here. Why is that not exactly the misrepresentation of the product itself that they were getting? You have to confront the Brookhausen case out of the Ninth Circuit where the seller was told that the goods were not going to be sent to the enemy at the Soviet bloc. The seller never would have sold the goods to Brookhausen if he knew that Brookhausen's intention was to sell them to the enemy. And the Ninth Circuit held that even the misrepresentation by Brookhausen that he was not going to sell these goods to the enemy was not sufficient to constitute a fraud. In Takalov, there was an obvious misrepresentation that affected the decision of the patron whether he was going to go spend $2,000 at a nightclub thinking he had a date who was interested in his affection when it turns out she was just working him for the commission. But in Takalov, it seems like that was a distinguishable situation and the reason is because even though there was sort of this secret partner involved that the businessmen did not know about, the businessmen were in cahoots with the woman and the bargain was that they would take the woman out, they would buy her drinks and whatever happened, happened. So there, and in fact, we said in that case that the only omission we were considering was the fact that they did not tell the businessmen that they were in cahoots with the bar owners. And so the bargain there did not involve the sale or the offering of an item at all. It just involved taking the woman out. Here, however, we're talking about a direct interaction. The terms of the bargain, the nature of the bargain itself, the only reason that money is being exchanged at all in this case is because the defendants here have told the companies here that they are sending these supplies to the United States military and to the United States government's Afghanistan supply situation to help in a humanitarian way. When in fact, they're doing nothing of the sort. So there it goes to the nature of the bargain, whereas in the B-Girls case, it was not going to the nature of the bargain in tackle-offs. So why isn't that a distinction that matters? I know that Stephanie's going to stop me. May I answer your question? No, she won't. Okay, so there's two cases we're talking about there. So in the first place, the goods were being sold by Javad into the export market, supposedly. The U.S. military was a customer, but it was for profit. This was not a charitable event. The sellers knew that Javad was simply doing a government bid that would be paid for by the U.S. government. All of that was a lie. But one thing was clear, Javad was in it for a profit and the seller knew it. What about Maxwell? Maxwell's a government, a case involving government benefits that were misdirected from people who the government intended those benefits to go to, to the defendants. And so the identity of who gets the government benefits was the object of the fraud. In this case, the sellers all set a price where they gained a profit. They just thought they could hold out for more and they were simply unable to allege in the indictment, the government was unable to allege in the indictment, much less prove at trial, that this transaction that they entered into with Javad caused them a loss. In fact, if we- But why does that make this case like tackle-off? Why does it make it like tackle-off? Because in tackle-off, the individual never would have gone into the bar and spent $2,000 on a bottle of wine or champagne had he known that he was sharing it with an employee of the bar. And so he entered into a transaction, he otherwise- He never entered into a transaction. The problem is in tackle-off, we limited our analysis to the interaction between the business person and the woman, not between the business person and the payments later at the bar. Here, we're talking about an interaction between your clients and the companies directly. And there is an exchange of money involved in that. There's no exchange of money between the woman and the businessman in the nature of their bargain, which is the businessman is going to take the woman out for drinks. So why does that not affect the analysis? So the B-girl was an agent of the defendants in tackle-off, right? And so- But the omission there, the omission there is that she did not tell them that she was their agent. It was a misrepresentation. She indicated she was a tourist traveling to South Beach here for a good time, misrepresenting who she was. In fact, she was- She did not offer them drinks. She did not enter into the contract with them for drinks. She entered into the contract with them to have them take her out. Now, they chose to spend the money on the drinks. I mean, I don't- I just want to make sure I'm giving you an opportunity because, to me, I'm not getting why this is more like tackle-off than Maxwell, and I want to make sure I'm not missing something. I know I've taken you over your time, but I want to give you one more chance, and it might be me. I'm just not getting it, but one more time, tell me why this is the same as tackle-off and different from Maxwell. In both cases, the so-called victim has provided misinformation, misrepresentations that lure the victim to enter into a transaction the victim otherwise would have avoided. In tackle-off, the victim patron would not have spent that money based on the representations of the defendants and the co-conspirator of the defendant. She, the B-girl, was working for the defendant. So, through the B-girl, a misrepresentation was being made, and the defendant induced the patron to part with his money under a false pretense. The government indicted that case. Conviction. Appeal. Reversed. Government made many of the same arguments that we're talking about today, and they were rejected by this court. In Javad's case, he makes a misrepresentation that induces the seller to offer it at the There's no injury at the point of sale, and this is another very important point. Had Javad taken those goods and burned them? You're mixing in a different, you're mixing in now a different sort of argument. I'm just asking you to tell me why this is like, I think you've already done it, why you think it's not like tackle-off, why you think, or why you think it is like tackle-off and not like Maxwell, but I think you've done it. There's no financial injury to the victim. They would have liked to charge a higher price. Apparently, they never would have gotten it, and so they're better off having entered into this transaction for the profit they did get from Javad than if they had not got into these transactions at all. Thank you very much, Mr. Straubner. All right. We'll hear next from Ms. Anderson. Good morning. Rhonda Anderson on behalf of Louis Soto. I've chosen to cover some issues dealing with evidentiary issues because it will cast a different view of the evidence at trial as well. You may already be aware that Mr. Soto has been released, so that obviates some of the need to address some of the sentencing issues. The issue I'd like to address is the exclusion of the expert witness testimony that was requested in order to be able to present a complete defense. It would have shown Mr. Soto's state of mind as well as impact the credibility of an important government witness and the 404B evidence that the government entered into evidence in this case. Are you waiving the sentencing issues? Not waiving the sentencing issues, but it's not front and center right now. Let's say we go back to trial, we will need to deal with those then, but it's not the critical issue that I think needs to be discussed today because if we go back to trial, we need to deal with this evidentiary issue as well. When you interview an import broker, and I'm standing from a position of having interviewed import brokers, they're not all the same. They don't have the same level of expertise, just like if you would interview an attorney. They do your will and trust. You wouldn't be choosing somebody that does immigration. You need somebody with experience in that field. There are brokers that deal with gray market product and there's brokers that do not. The government argued that gray market was not an issue in the case, but in fact they presented evidence and they presented a theory that in fact made it front and center. They argued it carefully to show that it made no sense to have a product coming back into the market as gray market, but the area to where the government should have argued that is the United States Congress because it is legal to bring in gray market product. I cited in the brief some California statutes where you have to mark the product more carefully. It's been a problem in the United States with gray market coming back in for very many years, but to convict an individual who didn't have the benefit of the expert testimony to explain that this is something that does occur in the United States, that it's normal, that it's ... I'm not going to go as far as say not illegal because I know the court could have instructed on that. I want to hone in a little bit here. As I understand your argument, what you're saying, everyone seems to agree that these regulations were not an issue here. In other words, whether they violated them or not is not the reason why he was charged with a crime. As I understand why you wanted this evidence was that one of their cooperating witnesses, Mr. Dacos or Daskos, testified that in his view there was no legitimate reason to engage in this transaction to ship the goods out and then bring them back in. So far am I have that right? You do. Yeah, the August 21st. Here's my question. Can you show me where that you argued to the district judge here that that was the reason why you wanted your expert witness to testify? It was the state of mind argument to show that his understanding of the transactions themselves were not ... It was renewed afterwards and then it was argued again. Can you show me where that you made the specific argument you're making to us, which is because the cooperating witness testified that there was no legitimate reason to engage in this transaction that you needed an expert witness to rebut that to show that there are lots of legitimate reasons why one would, for no apparent reason, send goods to Dubai or Europe or wherever just to bring them back here to sell at CVS? These arguments happened directly after the Daskos testimony, so I think it was quite obvious that it was not only in relation to that, but it's the government's theory of this case as well and pushing in the 404B evidence to show that he engaged in gray market transactions before ... Here's the issue that I'm having, counsel. So as I understand, and I've read the relevant portions of the record here, the district judge here was relying on a letter that had been submitted and the government's motion in limine, which had set forth the basis in which that you sought to introduce the expert testimony. And then what the district court did is then go through each of the reasons why and said, here's why I don't think it should come in. It would be misleading to the jury, it'd be confusing, it's irrelevant because it's not an issue, it goes to good conduct as opposed to prior bad acts, and also it casts negative light on the victim. Those were the five reasons the district court gave for doing so. But as best as I can tell, nothing that you've said here to us, which is this witness testified to X and we needed to rebut that, was presented as a reason to present the expert evidence. Can you show me where, maybe I'm missing something or where I'm misunderstanding? Again, I said it was argued right after Daskos' testimony was brought in for that reason, as well as the government's theory itself. Because if you look at a case like this, you anticipate that it's relevant for the jury to understand how the business operates and how industry operates. It's not unusual for product to come back into the United States. It can come back for a number of different reasons. And for that reason, I think it's relevant, plus the government came in with 440B evidence of the very type of transactions that we're talking about here. How can we rebut that unless you have an opportunity to confront that evidence with evidence to This is a normal course of business. It would not have presented a red flag for Mr. Soto to be seeing this happening there and to, you know, look, dig deeper into the transaction and say something is amok here that we have to really look at the transaction carefully. People protect who their clients are all the time, who they're selling to. So that type of conduct, you know, hiding who they're selling to is not something unusual. So am I over? You are. I am. I'm sorry. Okay. We asked you a question. You were responding. All right. Thank you, Ms. Anderson. You have reserved two minutes for rebuttal. Thank you. We'll hear next from Mr. Binhack. May it please the court, I represent Penco and Cal Holding, the third party petitioners in the forfeiture proceeding. I'd like to concentrate on one issue and I'll rely on the briefs for the rest. I'd like to concentrate on the breach of the corporate bail issue. Penco and Cal Holding are Delaware corporate entities in good standing and owned by lawful, irrevocable Delaware trusts with independent professional trustees. The companies are the undisputed record title holders of the realty, which is untainted, which are untainted substitute assets. Can I ask you a question? Yes, sir. I think I agree with you on the law. In other words, that these are the things you have to do to breach the corporate bail. But I guess my question is, is that what the district court did here? Because it seems to me the district court breaching the corporate bail is where you were trying to hold someone liable for actions by another entity. So what you're saying is this entity is really a sham and so we're going to hold them liable. That's not what happened here. In fact, it's the opposite. It's that these entities are a sham and so they have no interest here. And that seems to me a very different inquiry and a federal inquiry, one of interest or injury for purposes of Article III, that's very separate and apart from whether we're going to pierce the corporate bail to hold either the owner of the company or another entity liable for the debts of somebody else. I don't think it'll surprise you that I disagree. Tell me why. Okay. So if you look at Gasparini versus Portomingo, which is the case that we cited, that says specifically, even if a corporation is merely an alter ego of the dominant shareholder or shareholders, the corporate bail cannot be pierced so long as the corporation's separate identity was lawfully maintained. The district court here said that Javad was essentially the corporate, not essentially, the cowholder. And it made that decision, and I think it should have applied state law, because it made that decision even though both companies had record title to the properties prior to the indictment. Both companies were owned by the Delaware Trust. And this is critical, Judge, that I'd like to say. And in order to buy the Penco apartment, the trustees gave unanimous authorization. And in order to put the cow stock into the trust, the shareholder and the board gave unanimous. So here's the issue, though. Again, and this goes back to sort of the fundamental nature of what piercing the corporate bail is. The purpose of corporate entities are liability shields. That's the purpose here. And piercing it takes off the curtain for liability shield to then allow you to go inside to hold folks liable. But that's not what happened here. In other words, we're arguing about, again, I don't think I disagree with your description of what needs to happen and that this is generally a state law matter. But in an inquiry of whether a company is injured under Article III, that seems to be very different from holding someone liable in a preceding supplementary or some other reason why you would actually pierce a corporate bail to hold the owner liable. Well, again, I disagree, because the corporate structure is going to decide where the injury lies. The corporate structure cannot be breached. Since Avertex, the Supreme Court of Florida has been 100% clear that even when you have a single member, LLC, we respect that. Otherwise, there is no corporate form anymore. So we can't just roll over the corporate form and say, and therefore, Javad is the alter ego. I accept your position that the corporate form, the piercing the corporate bail is normally to stop, to allow a creditor to get through. But in essence, isn't that really what's going on here? The United States, by virtue of the preliminary order of forfeiture, would like to say, we're a super creditor. We get all sorts of rights under the forfeiture laws that no creditor would get. And we have to, and the United States has to enforce those rules over state law. And when they want to bypass the corporate form and say that it's really an alter ego, that Javad is really the alter ego, you can't get there without going through Florida corporate law. Why even under Florida laws was the evidence not sufficient to show that Mr. Javad was the alter ego of these entities? Well, we had two companies which are record holders of the property. That's undisputed, period. We have neither company, the department could not have been bought without the authorization of the trust. It was contrary evidence, though. I guess what I'm saying is the district court had some evidence. You certainly have evidence. I'm not saying it's undisputed here, but didn't the district court weigh those evidence and make a finding regarding that? Yes, but critically, under Honeycutt, critically, this was untainted substitute assets. And the doctrine of relation back does not apply. And every single fact that the district court relied on was prior by years to the preliminary order of forfeiture, by years. And let me just say one thing about Gilbert, because I think it's really important. Gilbert, when the court entered the preliminary order of forfeiture, it gave Javad all the interest in the realty. But at the preliminary hearing, the district court collapsed Mr. Javad into Penco and Calhoun. Under Gilbert, this court said that Gilbert only owned a limited partnership, not the company. And the jury gave the forfeiture to the company. And this court said, you can't jump through corporate form, because Gilbert had an inalterable interest in the company, which does not necessarily own the property of the company. And the government only had an interalterable interest in the property, in the bicycle club. You couldn't get there. And so here, even if we take the district court at its word that Javad is the alter ego of Penco and Calhoun, all he owned, all the United States got under the district court was the company. And the district court held specifically that I need not be convinced of these points, that a shareholder doesn't own the property of a company. They are clearly supported by the evidence presented and longstanding legal precedent. Furthermore, the government does not challenge these assertions. So the last thing I would say, because my time is up, is that for the same reason that the major shareholder of Apple can't just walk into the Apple store and grab a computer, even if Mr. Javad stands in the shoes, because of alter ego, of Penco and Calhoun, the United States has not gotten the properties, which are 100% inalterably in the record title of the companies. You can't collapse those things. And that has to be, Judge Luck, I submit to you, that has to be a Florida law question, because it deals with the ownership of the property. And if we were in Delaware or we were in Georgia, it would be an even harder burden, a higher hurdle to climb. I don't want to overstate my welcome. All right. I think we have your argument. Thank you very much, Mr. Binhack. All right. We'll hear next from Mr. Lieberman. Good morning, Your Honors. May it please the Court. Dave Lieberman for the United States. With me at counsel table is the Assistant United States Attorneys, David Turkin and Jonathan Shipley. We're asking the Court to affirm. I will address the issues that opposing counsel has raised, and I welcome the Court's guidance as to any other issues with respect to claims or facts. I'm prepared to address anything in the record here. As to the primary claim, that the charge conduct does not constitute wire fraud, I want to sort of segregate out, as Judge Luck did, between Javad and Soto, because I think they come to this Court in different procedural postures. Let me start with Javad. As this Court has noted, he pleaded guilty, unconditional plea, that waives defects in the indictment. The entire argument today is that this goes to the subject matter jurisdiction of the Court. It can't be waived. We disagree with that. So the indictment under Federal Rule of Criminal Procedure 7, all it needs is a short and plain statement of the count alleged. And we did that, Documentary 145, pages 3 and 4, identified the wire fraud conspiracy, the elements, and named Mr. Javad. That's all we needed. Mr. Shrebnik has referenced other portions of the indictment that occurred later about the purpose of the conspiracy, means and manner of the conspiracy. This was a speaking indictment. But those other points were not necessary to bring this case. The government often obtains speaking indictments that have that to give the defendants notice of our theory. But it's not required. And if it's not required, then it doesn't go to the District Court's subject matter jurisdiction. Everything that the District Court needed to open this case is found on that count 1 paragraph. And we cited the Grumman case from this Court for that proposition. We noted in our answering brief that perhaps Mr. Javad could find some way to challenge the District Court's plea colloquy, be here under plain error, that somehow the District Court, through the factual basis or through the questions, didn't address all the offense elements in this case. But as I read the reply, Mr. Javad is very clear, I'm attacking the indictment, that goes to subject matter jurisdiction. And we think that's waived. Turning to Mr. Soto, the offense conduct here falls squarely within the wire fraud statute. The scheme, which Javad led, obtained the manufacturer's property by means of false representations and false promises. That is the traditional, classic formulation. And it is supported by this Court's decision in Tackle Off. Because the key portion of Tackle Off is, has the defendant lied about the nature of the bargain? That's at page 1134. And this Court in Tackle Off said that misrepresentations that affect price, price, that particular term of the bargain is the type of thing that goes to the essence of the bargain. It springboards off of some of the Second Circuit cases that Judge Locke cited. This misrepresentation went to the price that the victim manufacturers were willing to pay. Under a clear reading of Tackle Off, that is squarely fraud. My understanding of the scheme in Tackle Off aligns with the description that Judge Rosenbaum, your questions, had raised. The lies there induced the businessman, the victims in that case, into the bar. That was deception. But when they got to the bar, the businessman entered a monetary deal with the club, the money for drinks. And there was deception, but the deception did not go to the essential term of that money for drinks bargain in Tackle Off. That is quite different here. The factual basis of Gervaud's plea, Documentary 418, page 15, factual basis, the companies would not have offered these discounted products but for the misrepresentations. And that's consistent with the evidence at Soto's trial. I'm struggling to see how Simonelli has anything to do with this case. The Supreme Court rejected the right to control theory, the idea that my lies to someone else that affects that person's economic decisions, that's not fraud. In this case, we have that critical act of obtaining. The scheme sought to obtain property held by the victims. Again, classic fraud. And that loops into the Maxwell case that Judge Rosenbaum cited. And in that case, that was the case where the defendants lied to obtain construction contracts, pretending that they were minority or disadvantaged businesses. This court in Maxwell, and we noted a recent Third Circuit case, Kosice in a Rule 28 jailer says the same thing. This is fraud because the defendants, through their misrepresentations, obtained property in the form of contract or contractual payments that they were not entitled to, even though there was nothing in indication in Maxwell that the price would have changed or that the victims in that case didn't get the construction project that they wanted. They were denied an essential term of the bargain. Last case that Mr. Shrevenick raised was the Ninth Circuit Bruckhausen case. And I think that actually supports the government here, and I'll explain why. So Bruckhausen was the case where the defendants purchased technology from U.S. companies at full price, and in the course of doing so, gave assurances to the victim companies that they wouldn't export to Soviet bloc countries. Those were lies. The Ninth Circuit said, under this transaction, not wire fraud, because under the transaction, the victim companies lacked a property interest in the destination of their products. But at page 467 of that opinion, the Ninth Circuit goes out of its way to say the manufacturers received the full sale price for the products, they clearly suffered no monetary loss. That is not the case. They would have sold the products to that company no matter what. Correct. The assurance wasn't part of that bargain. That takes me to my next point about Bruckhausen. There's a two-judge concurrence in Bruckhausen, page 470, where the two-judge concurrence said, if a seller demands, as part of the deal, that the buyer, that technology would stay in the United States, and if the defendant lied to evade that condition, he's committed fraud. That's exactly what happened here. And I want to respond to one point, a factual point, that Mr. Shrevenick has made, which is the idea that it can't be fraud, there was no harm to these companies' monetary interest, they got five quarters instead of six, they still profited. That's not what the record shows at Soto's trial. Obviously, we don't have a record for Mr. Jabbot, because he pled guilty. But at Soto's trial, I'll give a couple examples. The Sklar witness, Document Entry 395 at 46. We gave away some of the items away to Jabbot at cost. The Andover witness, Document Entry 395, page 182. The pricing that Andover offered was tethered to the materials cost. Parkell, Document Entry 396, page 675. We would be, quote, out of business, end quote, if we'd offer these prices widely. So this was, in many cases, this wasn't a profit. But it also doesn't matter, because an essential term of the bargain, this goes back to some of Your Honor's questions, was the companies agreed to offer this discount pricing because they felt it was in their company's interest to support Afghan reconstruction efforts, U.S. reconstruction efforts in Afghanistan. They bargained for that term. There was also testimony at Soto's trial that, although this wasn't going to be a, these transactions may not have been profitable at the time, some of the companies had primarily a domestic presence. They wanted to, they thought maybe this would burnish our reputation in the export markets, and maybe we would get additional business down the line. They were denied the benefit of that bargain. So this conduct falls squarely within the fraud statute. Unless there are any additional questions, I can turn to Soto's main evidentiary claim, the district court's exclusion of Mr. England, the customs attorney. And Ms. Anderson's point was, well, we needed this to rebut some of the government's testimony. Judge Luck's questions that sort of previewed the government's lead argument, that was about we needed them to show that these were legitimate transactions, they were economically beneficial transactions, there was nothing wrong with that. We don't see anywhere on the record that the, where the defense counsel proffered that. And so I think we're here at minimum on plain error. And I just want to also be clear as to what the point, the alleged rebuttal that they wanted to use was. Mr. Doskos was a cooperating witness. He testified that there was no legitimate reason for these very erratic or circuitous shipping patterns, like Georgia, United Kingdom, immediately back to Miami. And he specifically tethered it to economics. He said, no legitimate reason because the distributor would be throwing their money away in this circuitous shipping. That's that documentary, 396 at 200. So maybe this argument would have legs if there was an expert in shipping, manufacturing, sales, sort of the economics of these transactions. But Mr. England was never designated as an expert in manufacturing or sales. He was just designated as an expert in customs laws and FDA regulations. So even if these were 100% compliant with the FDA regs or US customs laws, it's not responsive to Doskos' testimony that these transactions made no economic sense. One follow-up point on this, to the extent that the court had, we don't think the district court abused its discretion, 702 disputes, the district court here said, not relevant and it would create juror confusion on the relevance of these collateral areas of law. But my last point is, any error here was harmless because the government had overwhelming evidence of Soto's knowledge. And we've tried to chart this out at pages 31 and 35 of our answering brief. And I would like to point the court's attention to the emails amongst Javad, his conspirators, and Mr. Soto, document entry 381, 1, 2, and 3. Javad is on emails discussing the fact that, excuse me, Mr. Soto is on these emails discussing the fact that Mr. Javad is obtaining these products in the United States from US manufacturers, then shipping them overseas and then immediately back. And in the last email, Soto reminds everybody that the shipping paperwork should list Dubai as the final destination port because, in Soto's own words, this is where the supplier believes the cargo is going. So we think that is overwhelming evidence that Soto had knowledge that Mr. Javad was lying to the manufacturers to get their products. Unless there are any additional issues with trial, with Mr. Soto's trial claims, I would like to just briefly address some of the petitioner's claims. Opposing counsel has zeroed in on the standing inquiry. I am also struggling to understand how corporate law, Florida corporate law, intersects. This court's decisions on Article 3 standing, I'm thinking notably the Viamat case and the other cited in our brief, when they're addressing Article 3 standing for injury purposes, there's no mention of state law in those cases. And that makes sense because for CAL, for PENCO to even come into this case, their exclusive method to come in and challenge the forfeiture is under 853N2, and that statute says any person other than the defendant asserting a legal interest in property which has been ordered forfeited can come to the district court and file a petition. So that phrasing, any person other than the defendant, that's a federal statute, I could find no case law saying that state law has anything to do with the proper interpretation of those, of that language. And this court, in some of this court's decision, I'm thinking of Correll. That statutory standing though, the district court seemed to rule on an Article 3 basis. Yes, I agree, yes, yes, your honor, I just wanted to point that out that I think they actually do align, the statute's language aligns very well with the idea that these third parties have to come in with an injury, and that this is a federal law question, and that this court's case is Correll. There's a second circuit case, Cambio-Exacto, that this court has repeatedly cited for the standing inquiry, no mention of state law. And these decisions also say quite explicitly, we're not, district courts can look behind title documents or the property documents. If this were a matter of state law, was there sufficient evidence that these corporations were essentially a sham for Mr. Javad and under Florida law, and what would that evidence be? So I think the answer is yes, and number one, because I think as I read the Avertex decision, recognizing that I'm not an expert in Florida corporate law, a lot of the same factors that the Florida Supreme Court cited in its alter ego test are the same types of evidence that the district court cited. Basically, what was the relationship between these Cal, Penco, and Javad? They were created by Javad, they were for his benefit, he was meeting with the trustees and asking them to administer their trust for their benefit. The district court also noted that despite having a hearing, the district court couldn't find any evidence of a transaction that these entities had taken outside of Javad's orbit. These companies couldn't, after Mr. Cipral, the co-conspirator died, these companies couldn't identify the authorized representative who was controlling their litigation. And so that, combined with all of the other points that the district court mentioned about the lack of a bank account for one of them, the fact that Javad was for the condo had seemed to sort of tee up the condo purchase, and then at the last second, the entities come in. Didn't he direct in the trust documents that they were to act on his behalf and benefit the family? Yes, yes. And I think, so these are all things that the Florida Supreme Court would consider. So I don't see a material difference between what the district court did and some of the Florida law principles that opposing counsel has cited. Can I ask you sort of a more fundamental question? So the properties are located in Washington, D.C. and Georgia. Correct. If we're going to apply state law to determine the nature of the interest, why wouldn't we apply law from Georgia and Washington, D.C.? So this is, we have noted this point in our, we're not sure why these petitioners are relying exclusively on Florida law. I don't recall that- Well, regardless of exclusively, why, I mean, maybe we do. Maybe we look to Florida law because this case is in Florida. But like if we're looking for the nature of the property interest, why would we look to Florida law at all? I don't know, Your Honor. I would think that the most, if state law even comes into the analysis, it would be where the entities are domiciled. And I don't recall anything in district court or in the opening brief asking the district court or arguing to this court affirmative points about Delaware law or Georgia law. If it's all until the reply brief, it's all about Georgia law. So I don't know that we can assign error to the district court for failing to consider bodies of law in this entities that the petitioners never cited to the district court. So unless there are any further questions on this point, I just, I want to note that the parties have raised a number of other claims in their briefs in terms of sentencing, forfeiture, restitution. So I would like to pause to make sure that, see if the panel has any questions or concerns with respect to any of these issues. I really want to focus and point out the restitution issue. I mean, in our view, these victim companies, some of them are small businesses. One of them was veteran owned. They suffered serious losses on this. So that is very important to us. So before I sit down, I just want to make sure and ask whether the court has any concerns with any other aspect of this case or any other claims that Javad and Soto have raised. I'm happy to return my minutes to the panel. The government asks that the court affirm. All right. Thank you very much, counsel. Mr. Srebnick, you had reserved four minutes for rebuttal. Thank you. Government counsel imagines that this is a case where Mr. Javad and company were actually obligated to resell their goods in a particular location. This was not a contract to resell goods. Javad was not acting as a distributor. Had Javad bought the goods and simply burned them, the seller would have gotten the benefit of the bargain, the profit that was built into the export price. The so-called export price was a structure set up by the seller to discriminate against American consumers, that American consumers should have to pay more than foreign consumers, not an effort by the sellers to... I don't know that that's necessarily true. I mean, really, what all of these companies testified to was they gave the lower price because they thought it was going to Americans, they thought it was going to the United States military. This was a for-profit bid, and these were not the only sales, there were some sales that... I'm just taking issue with your suggestion that they wanted Americans to pay more. In the United States, that's the whole structure of price discrimination, is to force American consumers generally within the United States to pay a higher price than foreigners pay. That's the whole point of price discrimination. Well, again, though, two things on that, the first thing would be that they were sending it for the use of Americans, they thought, right? I don't think so. The US military was paying for it in the foreign country by local... Also for the US military to use itself. The bandages, in fact, I think it was the owner of maybe Andover, who was a Marine, and he said he wanted his bandages to be used by the United States military, and he wanted to help out that effort. I mean, so I'm just taking issue with the characterization. You're referring to a single vendor among the dozens that we ended up having to address at sentencing, and that one vendor may have had his heartstrings pulled, but that's not an economic injury, and that's the whole point. That vendor, the bundle of goods that vendor sold, although there were some that might be a low cost other than higher cost, every bundle of goods sold generated a profit for the seller. And this idea of controlling the destination of the goods was addressed... The government came up here and cited I think three specific pieces of evidence from trial which showed that these were sold at cost, which would not be profitable, and in some cases below cost or at a cost that would put them out of business. Two points. One is there might have been within the bundle of a sale of a hundred widgets, of widgets A through Z, some of those may technically have been under cost, but the other ones made up for it so that the bundle was a profitable transaction as a whole. And as to the issue, I think the other issue you raised would have been out of business. Parkell's testimony was, had all their goods been sold at this marginal price, they couldn't have sustained the business, and that's really the point. This is economics 101. If the marginal revenue of the sale exceeds the marginal cost... But you can't say that this was sold at a profit where they're telling you that if I sold everything at this, I would be out of business. You can. It's not a profit. No, no. That is a profit. If the marginal sale, the additional sale generates a profit because the additional sale exceeds the additional cost, marginal revenue exceeds marginal cost, that's what our expert explained in his expert opinion, that's a profitable transaction, even if the seller can't sustain that same price for every single one of the goods it sells. An important point, which is why we presented the expert, because perhaps, I mean, I had to go back into my college days to remember that principle from microeconomics. The expert is irrelevant for the Tarkalov argument, right? No, the expert's quite relevant because... Absolutely relevant for the Tarkalov argument because we can only rely on the indictment, right? But these are just, when I say the expert, he's not a fact witness, he's just general principles of economics. Sure. That's nothing relevant to what's in the indictment. So the indictment's purpose is, it did allege that it was sold at a price that was far below what otherwise would be sustainable, did it not? No, your honor. Your honor, the indictment alleged that the sellers offered export prices which are so-called deeply discounted from their list price. The indictment did not allege that that sale would generate a loss to the seller. Part of the reason is because there's an extra cost involved to the manufacturers in selling in the United States because they have to comply with certain labeling and other requirements that they don't have to if they're shipping it out of the country. None of which contradicts the basic principle that the seller charged a price to Javad that it thought generated a profit, otherwise it doesn't sell it. And if there was another buyer willing to pay the list price... Except for the point that Judge Luck made and the government made, which is that there was testimony that from at least some of the companies, that if they had sold all of their client at, they would be out of business. And that's a principle of economics that if the average price had been the marginal price, they couldn't sustain the business, understood that that was the testimony of that one company. But so long as the marginal... Make sure I'm making myself clear. Marginal revenue means the sale of the next good to Mr. Javad. That product, since there's all sunk costs built into creating that good, that good can be sold, that next sale can be sold at a price lower than earlier sales. Because for example, they already have inventory. It's already been built. They don't have to engage in additional costs to build that next product. Basic principle of economics. Marginal revenue exceeds marginal cost equals profit. And in this case, there was no one else willing to pay the list price at the moment Mr. Javad offered the export price, otherwise the rational seller would have sold it to the higher paying consumer. And there wasn't a higher paying distributor. I see that my time is up. I just would ask the court to take a look at footnote three of Simonelli that cites the Brookhausen case from the Ninth Circuit. Footnote three of Simonelli specifically cites the Brookhausen Ninth Circuit case about the arms export. And it appears to suggest that Brookhausen was rightly decided, even if it was a concurring opinion, and that the mere selling goods with a territorial restriction is not a property right cognizable under the fraud statute. Thank you, Judge. Thank you, Mr. Srebnick. All right, Ms. Anderson, you have reserved two minutes. Thank you, Judge Luck. I do have an answer to your question on page 243 of the same transcript on August 21st, beginning at lines 13 and continuing on at 24. And I'll just highlight a couple of the words, phrases, it was a long dialogue, where Mr. Becerra argues to the court that what the government was trying to argue is that because Soto was involved in custom brokering goods and came back in the country, may have left and come back. And somehow that shows that, like Mr. Daskos testified, that he has no idea what Mr. Javad and the manufacturers, but it must have been fraud simply because of the circumstances and dot, dot, dot, usual and customary practices of brokers and bringing FDA product in, and Soto had no notice. So I would direct you to that area. The government pointed out a couple of things that presuppose that Mr. Soto has full knowledge of the economics of the transaction. Gray market products such as even Apple computers is a prevalent thing that we have case law on before. Unless Mr. Soto had an idea what the marginal revenue was on these items, it would not give him notice. The other thing I'd point out is that the labeling was for the U.S. market. So there was no notice there. There was also no cost differential there, too. It wasn't Mr. Soto's concern about whether or not Mr. Javad was making a profit because he had nothing that was a red flag that would have set him off to know those things. Hiding one's customer list, hiding who you're selling to is a normal business practice in any of this industry. And so lastly, I'd point the court to Sheffield. The discussions beginning on page 1170 about how it was more probable that Mr. Sheffield's state of mind, the gift-making custom that was talked about by the court there, with that evidence in the record, the jury could have understood that like with Sheffield with the gift-making custom that otherwise looked like he was doing something illegal. If the jury understood that this gray market was not, or I should say the circuitous route was not an illegal act in itself, and it wouldn't have been a red flag to Mr. Soto itself, the jury would have found a different way for Mr. Soto. Thank you for your time. Thank you, counsel. All right. And Mr. Binhack, you also have two minutes. Thank you. I'll just make three points in light of the government's argument in the comments before. First, with regard to Article III standing, it requires an injury. Article III requires an injury. And this court has held that an LLC or a corporation is the actual owner of a property, not its shareholders. So the injury here will be to Penco and Cal Holding. I've cited those cases in my brief. Second, the district court specifically held in its final order that Penco and Cal Holding owned the property. It made that holding. Therefore, the injury is to them. Let me make a quick point on the letters of request that Judge Luck, you referred to. Letters of request specifically say, Mr. Javat writes the trustee and he says, I'm giving this property to an irrevocable trust and I understand I have no control going forward. He concedes the fact that he has no control and he shows his clear understanding of an irrevocable trust. And all he does in the letters of request is say, please keep in mind, trustees, as you're running the company, to do this for my benefit. But I recognize I have no authority. And then the third piece. We chose Florida law because that's where the court sits. If we were going to use another law, we would use Delaware law because that is the law of the incorporation of the companies. Can I ask you a question, sort of fundamental? I understand you chose Florida law because that's where the court is. But what is your authority for that being the reason? I mean, it seems to me, like from a common sense point of view, that if what we're interested in is the nature of the interest, right? And we are governing, and we are, then the nature of the interest has to be governed by the state law where the interest was awarded, right? I mean, doesn't it? That would be fine because Delaware law, let me answer this question first and then I want to go to your specific question. Okay. Well, I'm just trying to figure out what the right law is that we should be applying. Let's assume it's Delaware. Then piercing the corporate bail is even harder under Delaware law, and we've cited that in our brief. We still have to figure out, we may still have to figure out, which law applies. And in that case, I'm trying to get from you why you think that Florida law applies. What is the basis? The reason we chose Florida law. What is the authority that supports it? Is that the forfeiture laws give superpowers as a creditor to the United States and superpowers to the court. In a normal situation, if this was a normal quiet title, quiet title hearing, you would have to do it in the state where the property was by virtue of jurisdiction and by virtue of the local action rule. The forfeiture law says once we're dealing with forfeiture, the defendant's property, and we've already, I won't go into this, but we say this is not the defendant's property. But once you're dealing with the defendant's property, then the district court has nationwide jurisdiction and it can pull property anywhere. And it's talking about the in personam jurisdiction there because it's the defendant's property, no longer the property. And so from my perspective, Judge, at that point, it is proper because you're dealing with the court is attaching to the person and the person is here in this district or in the district wherever it would be. I think it would be appropriate at that point to use the corporate law of the person. That's why I chose that. But I am completely comfortable saying that the Delaware law should apply because these are Delaware entities. And that's why we cited that in our brief. I think it's either a footnote or an aside in a paragraph and I forget the page and I apologize. But it's even harder to breach the corporate veil under Delaware law. And no matter what, we're talking about breaching the corporate veil, we're talking about alter ego. We're not talking about necessarily where the property is because the judge, the district court judge, compressed the company into Javad. He said that Javad was the alter ego. And that's the Gilbert problem that I mentioned before. Even if Javad gets the companies, is the companies, that doesn't mean that he owns the property of the companies. And so this is a corporate problem. I tailed off at the end of that on extra time. I apologize. That's 13 seconds you'll never get back from your life. That's okay. Thank you very much, counsel. Thank you. Have a nice day. You as well.